ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Red Bobtail Transportation | ) ASBCA No. 63771 |
| | ) |
| Under Contract No. HTC711-14-D-R028 | ) |

APPEARANCE FOR THE APPELLANT:      Michael D. Maloney, Esq.
                                            Williams Mullen PC
                                            Tysons Corner, VA

APPEARANCES FOR THE GOVERNMENT:     Caryl A. Potter, III, Esq.
                                            Air Force Deputy Chief Trial Attorney
                                            Geoffrey R. Townsend, Esq.
                                            Patricia W. Walter, Esq.
                                            Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE EYESTER
PURSUANT TO BOARD RULE 12.2

Red Bobtail Transportation (RBT) appeals a contracting officer's final decision (COFD) denying its breach of contract, good faith and fair dealing, and prompt payment claim for $798.22.[1]  According to RBT, the United States Transportation Command (USTRANSCOM or government) improperly deducted amounts from invoices for services RBT performed.  USTRANSCOM argues the claim lacks a certification and is untimely filed, and also disputes all of RBT's contentions.

RBT elected to pursue this appeal pursuant to the Board's Rule 12.2, Small Claims (Expedited) procedure.  Accordingly, this decision shall have no precedential value, and in the absence of fraud shall be final and conclusive and may not be appealed or set aside. 41 U.S.C. § 7106(b)(4)-(5).  RBT also pursued this appeal pursuant to Board Rule 11, in which the decision rests upon written

---

[1] Originally, the claim was for a total of $8,522.35 plus interest (compl. ¶ 1).  In its brief, RBT states that after conducting discovery, it realized of the 19 invoices it originally challenged, only two are timely (AGA0103 and AGB0093).  RBT therefore withdrew challenges to the remaining 17 invoices.  (App. br. at 2 n.1)  The total RBT argues is due is $292.88 for AGA0103 and $505.34 for AGB0093, plus interest (*id.* at 4).  After becoming aware of the reduced claim amount, each party still submitted the Rule 12.2 briefs.

evidence without courtroom testimony. Based on the following, we grant RBT's appeal in part and deny it in part.

## FINDINGS OF FACT (FOF)

1. USTRANSCOM awarded fixed-priced, multiple award indefinite quantity Contract No. HTC711-14-D-R028 to RBT, effective January 3, 2014, for National Afghan trucking services for three suites of services: bulk fuels (suite 1), dry cargo (suite II), and heavy cargo (suite III) (R4, tab 1 at 1, 4, 12; tab 2 at 19, 21, 24). The period of performance included a one-year base period, 2 one-year option periods, and a 6-month option to extend services period (R4, tab 1 at 4-6). The contract incorporated by reference RBT's proposal and included as attachments a Schedule B, Unit Price Schedule (3 JAN 14) and a performance work statement (PWS) (15 MAR 13), none of which were included in the record (*id.* at 9, 55).

2. The contract incorporated by reference Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS—COMMERCIAL ITEMS (FEB 2012) (R4, tab 1 at 9). In addition, the contract included FAR 52.216-18, ORDERING (OCT 1995), which states that all delivery and task orders issued are subject to the terms and conditions of the contract (*id.* at 11).

3. As relevant here, USTRANSCOM exercised a 3-month option to extend the contract and issue a delivery order to RBT through March 16, 2017 (app. supp. R4, tabs 1, 2). The parties agree that the PWS effective February 1, 2016 is applicable here because the disputed invoices are for deliveries in January and February 2017 (app. br. at 6; gov't br. at 1-2).[2] There is nothing in the record showing the modification which incorporated this revised PWS and whether it was signed by RBT.

4. The relevant PWS detailed the "common mission requirements and standards that apply to each suite of transportation service." To start, the government would issue a transportation movement request (TMR) for a mission for a single asset which specified the terms and shipment data. (App. supp. R4, tab 3 at 33) The terms included the required spot date (RSD), required load date (RLD), required delivery date (RDD), and adjusted RDD (ARDD). The RSD is the date the asset is required at the origin location and is two days prior to the RLD. The RLD is the date the asset is required to be ready to upload the cargo. The RDD is the required date of delivery by the contractor and is met when the asset is at the entry control point waiting area of the destination location. Finally, the ARDD is the shift in delivery date based on actual load date; the adjusted RDD cannot be sooner than

---

[2] The parties filed only one brief each and the Board's Order dated April 10, 2024 explained that the briefs should be akin to reply and sur-reply briefs or used to expand upon specific disputed facts or legal points.

the original RDD. All missions ordered were to be paid based on the number of mission units (MUs), which were in 25 kilometer increments, between the origin and destination on the TMR. (App. supp. R4, tab 3 at 34) Almost all missions required security support and, in some cases, RBT was required to provide the security using the Afghan Public Protection Force (APPF) (*id.* at 43-44). RBT was responsible for meeting all RSDs, RLDs and RDDs (*id.* at 36).

5. The initial contract did not contain a section on deductions for missions completed a day late, which is the issue in this appeal (*see* R4, tab 5 at 3-10 (COFD)). Rather, it set forth performance objectives and stated the performance thresholds for the RLD and RDD were 90 percent on time (PWS at 30, available at https://sam.gov/opp/837518d0a84a30a765535dd0f3e20638/view). The government would use these performance objectives to assess contractor performance and if a contractor failed to meet the minimum performance objectives, it could result in less future task orders or other remedies (*id.* at 29-30).

6. The February 2017 revised PWS was different. This PWS stated that a failed/partial pay mission included a completed mission where the contractor failed to meet the RSD, RLD or RDD (app. supp. R4, tab 3 at 40). The PWS set forth a point system to partially compensate contractors for failed/partial pay missions as follows:

> For each mission, missing RSD, RLD, or RDD (RDD when not exclusively caused by APPF) constitutes as one point each (each point earned is a 25% full pay reduction) resulting in a possible maximum of 75% full pay deduction for missing all three (RSD, RLD, and RDD). However, in the event the missed RDD was exclusively caused by APPF, in lieu of the 25% full pay reduction for missing the RDD provided above, the reduction for missing the RDD will be applied in the following manner:
>
> Cargo delivered one day beyond the RDD - the contractor's rate will be reduced by AFN 3,190.00 per invoiced escorted mission unit. This reduction will be applied before any percentage reductions.
>
> Cargo delivered two or more days beyond the RDD – the contractor's rate will be reduced by AFN 6,380.00 per escorted mission unit. This reduction will be applied before any percentage reductions.

3

In the event the contractor missed the RDD for a combination of reasons, of which one includes APPF, the AFN 3,190.00 or AFN 6,380.00 stated above no longer applies and the contractor shall receive a one point reduction (25%) for missing the RDD. It is the contractor's responsibility to prove to the Government's satisfaction that delays were caused solely by APPF and that delay was directly related to missing the RDD. If the contractor is unable to clearly demonstrate with adequate documentation that APPF was solely at fault for missing the RDD, a one point reduction (25% of the full pay) applies for missing the RDD.

For example: Missing RSD, but meeting RLD and RDD equals 1 point. Missing RSD and RDD (not exclusively caused by APPF), but meeting RLD equals 2 points or a 50% full pay reduction). In the event the contractor misses RDD by one day exclusively caused by APPF and earns one point as described above, the AFN 3,190.00 shall first be subtracted from the total mission price prior to applying the percentage reduction.

For example: Contractor A had a mission from ING to KIL for six (6) MUs valued at AFN 100,000.00. The mission was completed and the customer received their equipment in proper condition. Contractor A failed to meet RSD, but met RLD and RDD. For missing RSD, this is a Failed/Partial Pay mission and the Contractor has one (1) point. The Contractor will be paid AFN 75,000.00 (100,000 x 75%).

(*Id.* at 41) The PWS also included a section titled "Performance Requirements Summary," which set forth performance objectives as designated in the quality assurance surveillance plan. According to the objectives, which the government would use to assess RBT's performance, RBT was to meet the RLD and RDD 90/95/98 percent based on random sampling or periodic inspection. (*Id.* at 46) The PWS explained that the first percentage was the minimum acceptable performance standard and the subsequent numbers represented objectives for which RBT would be considered for a performance award.

4

7. There are two transportation movement requests at issue here and in both cases, there is no dispute that RBT delivered the required fuel one day late (app. br. at 4; gov't br. at 3). For the 2000 gallons of fuel delivery of AGA0103, which had security, we find the following:

| Arrival at Origin | RSD | RLD | RDD at Gamberi | Arrived at Destination |
|---|---|---|---|---|
| January 8, 2017 | January 10, 2017 | January 12, 2017 | January 14, 2017 | January 15, 2017 |

(App. supp. R4, tab 6a, Fuel Tab, cells A7, C7, F7, G7, H7, I7, J7, K7, L7, M7, N7, O7) The contracting officer's representative (COR) noted that RBT missed the delivery date by one day and deducted AFN 25,520 (*id.*, cell AA7). In response, RBT stated that it requested a "call sign" on January 10, 2017 which was not issued until January 11, 2017 for January 15, 2017, a day after the RDD. RBT also argued the adjustment was incorrect. (*Id.*, cell AB7) The COR responded: "Adjustment Made" (*id.*, cell AC7). On February 17, 2017, RBT again asked the COR to remove the deduction and the COR responded: "Adjustment Made" (*id.*, cells AD7, AE7). The contracting officer, however, made a note that RBT was a day late and it was not clear why they requested removal of the deduction, but agreed that the deduction was incorrect and should be "AFN 19,140" (*id.*, cell AF7). USTRANSCOM deducted $292.88 (*id.*, DFAS Deductions Tab, cell G41).

8. For the 1,000 gallon fuel delivery of AGB0093, with no security, we find the following:

| Arrival at Origin | RSD | RLD | RDD at Fenty | Arrived at Destination |
|---|---|---|---|---|
| February 9, 2017 | February 10, 2017 | February 12, 2017 | February 14, 2017 | February 15, 2017 |

(App. supp. R4, tab 6b, Fuel Tab, cells A15, F15, G15, H15, J15, K15, L15, M15, N15) Here, the COR stated that RBT missed the RDD by one day and RBT agreed (*id.*, cells AB15, AC15). USTRANSCOM deducted $505.34 (*id.*, DFAS Deductions Tab, cell G42).

9. On January 26, 2023, RBT submitted a claim for breach of contract and good faith and fair dealing in the amount of $8,522.35 (R4, tab 4 at 1, 5). The claim states that a certification was attached, but there is nothing in the record showing this (*id.* at 8). The claim argued, as RBT does here, that these deductions are penalty provisions and therefore unenforceable and in conflict with FAR 52.212-4 (*id.* at 5-7).

10. On September 28, 2023, the contracting officer denied the claim contending, as the government does here, that the claim was late and there was no breach because the PWS allowed for these deductions and this type of negative performance incentive is permissible (R4, tab 5).

<u>DECISION</u>

In count I of its complaint, RBT contends USTRANSCOM breached the contract by deducting money from invoices pursuant to an unenforceable penalty provision that also conflicted with the limitation of liability paragraph set forth in FAR 52.212-4 (compl. at 7). In count II, RBT contends USTRANSCOM breached the duty of good faith and fair dealing when it deducted money from the invoices for the missed RDD despite RBT meeting the ARDD and the money deducted far exceeded adequate consideration (*id.* at 8-9).

In turn, for the first time and in its Rule 12.2 brief, the government argues the Board lacks jurisdiction because the claim was not certified (gov't br. at 6). The government argues that on the same day, RBT submitted two claims to the contracting officer, this one for fuel deductions in the amount of $8,522.36 and not certified, and another for dry goods deductions in the amount of $143,205.90 which was certified. The government argues the two claims are "essentially identical" and based on the same set of facts and same contract, and therefore there is no justification in treating them as separate. (*Id.* at 7)

If the claims involve an examination of different operative facts, then they should be treated as two separate claims. *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990) (for purposes of determining whether certification requirement is applicable, if claims arise from a common or related set of operative facts then a single claim exists). Here, the two claims are separate as they were based on different sets of invoices for different missions in different suites, and therefore involve an examination of different operative facts. Further, and most important, the claim in this appeal now involves only deductions for missing the RDD, while the other claim also involves deductions for issues relating to failure of global positioning devices "pinging" at least 80 percent of the time while on a mission (*see* R4, tab 5 at 2 (COFD)); *K-Conn Bldg. Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015) (stating that "for present purposes, we should treat requests as involving separate claims if they *either* request different remedies (whether monetary or non-monetary) *or* assert grounds that are materially different from each other factually or legally."). Thus, we have two separate claims. Therefore, pursuant to the Contract Disputes Act (CDA), the claim here, as it is less than $100,000, did not need to be certified. 41 U.S.C. § 7103(b)(1).

Next, the government argues (again for the first time in its Rule 12.2 brief) that RBT's challenges relating to the two remaining invoices are time barred. According to the government, the crux of RBT's claim is that the deductions set forth in the PWS are inconsistent with FAR 52.212-4 and are an unenforceable penalty (gov't br. at 9). Since RBT entered into the contract on January 9, 2014, the government contends the claim accrued at that time, or on either November 11, 2014 or February 1, 2016 when USTRANSCOM amended the PWS to include the deductions, or by March 24, 2015 when USTRANSCOM applied the deductions on an invoice for missing the RDD (*id.* at 9-10). In response, RBT contends that the proper test for claim accrual does not focus on the dates of the contract provisions but on the dates of receipt of the final invoices showing the improper deductions (app. br. at 2 n.1).

The CDA states that a contract claim against the government "shall be submitted within 6 years after the accrual of the claim." 41 U.S.C. § 7103(a)(4)(A). The FAR further provides that "[c]ontractor claims shall be submitted, in writing, to the contracting officer for a decision within 6 years after accrual of a claim, unless the contracting parties agreed to a shorter time period." FAR 33.206(a). "Whether and when a claim has accrued is determined according to [the FAR], the language of the contract, and the facts of the particular case." *Electric Boat Corp. v. Sec'y of the Navy*, 958 F.3d 1372, 1375 (Fed. Cir. 2020); *see also Kellogg Brown & Root Servs., Inc. v. Murphy*, 823 F.3d 622, 626 (Fed. Cir. 2016). The FAR defines "accrual of a claim" as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." FAR 33.201. In order for liability to be fixed, some injury must have occurred to the party making the claim; however, monetary damages need not have been incurred. *Id.*

Here, USTRANSCOM is arguing that immediately upon release of the PWS incorporating the basis for deductions (the first time being revision 5 dated November 11, 2014), RBT should have filed a claim, despite the fact the government had yet to make any deductions on RBT's invoices because the deliveries had not even occurred. It is not clear, at that time, what the injury would have been to RBT. Likewise, it is not clear what the injury would have been at the time RBT entered into the contract since the deductions at issue here were not even in the initial contract. Further, while there may have been a deduction on an invoice in March of 2015, those deductions did not occur on the invoices at issue here. And finally, we note that USTRANSCOM relies on *Electric Boat Corp.* to support its arguments. In that appeal, the court held Electric Boat did not have to incur actual costs for each submarine before filing its equitable adjustment claim because the contract specifically stated the contract price would be adjusted if costs increased due to a change in law. *Electric Boat Corp.*, 958 F.3d at 1376-77. The adjustment in price in that appeal was prompted

7

by the enactment of a new law, while here the calculation of the deductions was prompted by submission of the invoices, without which there was no basis for calculating the deductions. *See Strategic Tech. Inst., Inc. v. Sec'y of Def.*, 91 F.4th 1140, 1146 (Fed. Cir. 2024).

According to RBT, the claim accrued as of the date of the final invoices here--for AGA0103 on March 3, 2017 and for AGB0093 on March 14, 2017 (app. br. at 2 n.1 (citing app. supp. R4, tabs 6a, Invoice Tab and 6b, Invoice Tab)). While those were the dates RBT signed the invoice, the date the contracting officer signed them was February 28, 2017 for AGA0103 and March 13, 2017 for AGB0093 (app. supp. R4, tabs 6a, Invoice Tab, 6b, Invoice Tab). We conclude those were the dates the claims accrued based on the limited briefing here and because the invoices included cells for RB and the COR to make comments and address issues and the contracting officer to make the final decision. *See Afghan Premier Logistics*, ASBCA No. 62938 *et al.*, 22-1 BCA ¶ 38,074 at 184,905 (claims accrued the date appellant received the returned invoices indicating the challenged reductions). Since RBT filed its claims on these invoices on January 26, 2023, they are not time barred.

And now we finally reach the merits. RBT argues that the deductions are a penalty and unenforceable. Specifically, RBT contends that while the FAR allows liquidated damages to compensate the government, based on a daily rate, the PWS section here does not compensate the government but rather punishes the contractor (app. br. at 5-6). As RBT explains, with both deliveries RBT was one day late. For the 1,000 gallon fuel delivery in AGB0903, since there was security, the total deduction amounted to $292.88 and for the 2,000 fuel delivery in AGB0903, with no security, the deduction was $505.34. (App. br. at 6-7) RBT argues that these are random calculations which do not compensate the government because, for example, the deduction for the delivery of 1,000 gallons of fuel was less than the deduction for 2,000 gallons of fuel (*id.* at 7).

RBT also argues that FAR 52.212-4, incorporated by reference into the contract, states that "[p]ayment shall be made for items accepted by the Government that have been delivered to the delivery destinations set forth in this contract" (app. br. at 8 (citing FAR 52.212-4(i)(1))). According to RBT, the same commercial items clause requires this payment provision take precedence over other documents and attachments, and the government may only seek an "equitable price reduction" for nonconforming services (*id.* (quoting FAR 52.212-4(a))).

The government argues these PWS sections are negative performance incentives permitted by FAR 37.102 concerning performance-based acquisitions (gov't br. at 1). The government further states:

8

The purpose of this deduction (and the others defined in the PWS) was to provide an incentive for the contractor to perform at a level appropriate to the needs of the Government. The deduction was not liquidated damages and was not intended to compensate the Government for losses. The PWS set forth objective performance standards (e.g., meeting the RDD) and negative incentives (e.g. a 25% deduction) for failing to meet those standards. This is exactly what the FAR requires of agencies entering into service contracts.

(*Id.* at 2) According to the government, FAR 16.402-2(b) allows it to use positive and negative performance incentives in services contracts (*id.* at 1). The government also explains that the deduction for AGB0903 was less because although RBT missed the RDD by one day, it was due to the APFF (security) and the reduction was only AFN 3,190 per escorted mission. The deduction for AGB0903 was the "standard 25%" because the entire trip was unescorted. (Gov't br. at 4)

Finally, the government contends FAR 52.212-4 does not limit remedies to only equitable price reductions and adequate consideration for defective performance. Rather, the clause allows the government to exercise any right not prohibited by law. (Gov't br. at 3)

Because RBT challenges the deductions as liquidated damages, it has the burden of proving they are unenforceable. In *Metro Machine DBA General Dynamics NASSCO-Norfolk*, ASBCA No. 62221, 22-1 BCA ¶ 38,096 at 185,014, the Board explained that "liquidated damages clauses are perfectly allowable so long as they do not appear to have been designed as a punishment for late performance but, instead, reflect an attempt to place a value on late performance in circumstances where ascertaining that value would be otherwise difficult, if not impossible." Accordingly, RBT's "burden is an exacting one, because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be." *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1134 (citations omitted).

But the government states these are not liquidated damages when it explains the deductions are not intended to compensate the government for losses but rather to serve as a "negative incentive." And while the government explains, or provides some rationale, as to why the deduction for AGB0903 was less (i.e., due to security) than the deduction for the other invoice, this does not overcome the

9

government's own admission that these deductions were meant as a "negative incentive."

And so we look to the government's argument that the negative incentive used here was permissible. As noted, the government cites to two separate parts of the FAR as support--FAR subpart 37.6, Performance-Based Acquisition, and FAR subpart 16.4, Incentive Contracts (gov't br. at 1). FAR subpart 37.6 concerning performance based acquisitions discusses incentives (and does not specifically mention, although does not specifically prohibit, negative incentives). *See* FAR subpart 37.6. According to the government, the "purpose of the deduction . . . was to provide an incentive for the contractor to perform at a level appropriate to the needs of the Government" (gov't br. at 2). So, the negative incentive here was an incentive.

Performance incentives, when used, must correspond to the performance standards (performance level required to meet contract requirements in terms of quality, timeliness, quantity, etc.) in the contract. FAR 37.601(b)(2), (3); FAR 37.603(a). The contract included a performance requirements summary with performance objectives as designated in the quality assurance surveillance plan showing RBT was to meet the RLD and RDD 90/95/98 percent and that 90 percent was the minimum acceptable performance standard and 95 and 98 percent represented objectives for which RBT would be considered for a performance award (FOF ¶ 6). If the deduction was meant to have RBT perform at a level appropriate to the government's needs, then the deduction should have correlated somehow to the performance requirements set forth in the contract (the 90/95/98 percent performance standards). Since the deduction does not, or at least the government does not explain how it does, we cannot buy into the government's argument the deduction was part of its performance based acquisition plan.

Further, FAR subpart 16.4, Incentive Contracts, does state that positive and negative performance incentives shall be considered for certain service contracts. FAR 16.402-2(b). However, FAR subpart 16.4 applies when "a firm-fixed-price contract is not appropriate." FAR 16.401(a). The government cites to no clauses in the contract or any modification identifying it as a fixed-priced incentive contract (or any type of incentive contract) nor could we find any based on the record presented. Therefore, this subpart does not apply.

Because the government here has failed to provide any support for its negative incentive, we grant RBT's appeal and find it is nothing more than an

unenforceable penalty.[3]  For these reasons, we need not address RBT's other arguments relating to that issue.

Finally, RBT sought interest pursuant to the Prompt Payment Act (PPA) contending USTRANSCOM should have made full payment in March 2017 and failed to do so (app. br. at 10).  As the government notes, the PPA does not apply to a matter in dispute (gov't br. at 5).  Specifically, the PPA states it "does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract" as a claim related to a dispute and interest payable is subject to the CDA.  31 U.S.C. § 3907(c).  Therefore, we deny RBT's claim for PPA.

<u>CONCLUSION</u>

Based on the foregoing, the appeal is granted in part and denied in part.

Dated:  May 23, 2024

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 63771, Appeal of Red Bobtail Transportation, rendered in conformance with the Board's Charter.

Dated:  May 23, 2024

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

---

[3] To be clear, we are not holding that the challenged provisions of the PWS would be unallowable in all circumstances; merely that the arguments presented by the government here, in this non-precedential case, did not persuade us that the negative incentive was permissible.

11